Good morning, Your Honors. Good morning. We'll take the cases in the order in which they appear on the calendar. The first case is Vera-Villegas v. INS. Good morning. May it please the Court, my name is Carol Edward and it is my honor today to represent Jose Vera-Villegas, who is also present today with his social worker in the back of the courtroom. I just want to give a quick overview of the case. I realize that you are probably all very intimately familiar with this, but basically we have a case under the old immigration laws of suspension. We have the three criteria that are required on suspension cases of the seven years continuous residence, good moral character, and extreme hardship. The immigration judge denied the case on the basis of extreme hardship and seven years residency. The Board of Immigration Appeals did not address the issue of extreme hardship, but only addressed the issue of residency and denied his application on that I don't mean to interrupt the flow of your argument, but it might help your perspective, at least from one judge's point of view. My understanding is that we can't consider the hardship issue because of the Supreme Court's Ventura decision, since the Board of Immigration Appeals didn't address that, so that on that issue we would have to remand. I'm primarily interested in the seven years residence issue, and at least my understanding is that Petitioner's position on that is basically, as in any other kind of trial, a fact here, residence can be proved by affidavits of witnesses who knew me, and that ought to be enough without contemporary, heinous documentation at a period when I was homeless. Is that kind of the heart of it? Yes, I would say that is the heart of it. And I also recognize that it's very difficult, like you indicated, for this court to address the extreme hardship issue. I just don't know if we have jurisdiction. I thought we don't have jurisdiction. So if you disagree with that and you think we can address that, notwithstanding the Supreme Court reversing us in the Ventura case, then make your argument on that. I want you to have jurisdiction, but unfortunately I have to agree that we don't. David, if we did, since the BIA didn't reach that issue, we would remand. We would have to remand. And I do agree. I would have to go from there. So we can concentrate on the other issue of the seven years. Yes. And so the principal issue is, the only real issue in this case is, Ken, is it possible for a homeless person to establish they were physically present in the United States? What this judge wanted and what this judge asked for was a piece of paper that was created in 1989 to prove that he was physically here. And as it was an impossibility to provide evidence that he was physically present in the United States. And we did everything else we possibly could. And I also want to point out in this case, I want to go through a little bit about what the evidence is. Because the evidence presented, I believe, that there's no way that the court, a reasonable person, could find that he hadn't met the requirement with the level of evidence we presented. First of all, the I-213, which is the document that's created by INS when they arrested him, had the date of January 1989. We don't have an inconsistent statement about that date. Okay? The order to show cause, which charged him with being deportable, listed the date of January 1989. These are the documents that the government relied on in placing him in proceedings. The government... I'm sorry to interrupt. What was the first of those two documents with respect to arrest? Prior to the time they issued the order to show cause when they're interviewing him? Yes. And that's part of the record as well? I understand that's part of the record. And pardon me for being a little dense. I've read all the testimony, but I'm sometimes confused by these documents. When was this document created? It was created at the time his application was made. And that was when the order to show cause was issued in 1996. Well, I thought you said there was one document created at the time he was arrested. Yes, that was it. That's what drew my attention. Yes, it was at the time he was arrested in 1996. When he was arrested by the immigration, they created that document. I kind of thought all of a sudden that I'd missed something and that there had been an arrest in 1989. No, I apologize for confusing you. It was the arrest by the immigration officials in 1996 when they placed him in proceedings. They issued the I-213. And they do that. I assume they ask you what your name is. When did you come? The ordinary assumption, I would guess, is that the information came from him at the time of his arrest. That's correct. Which would show only it's not a fabricated late fabricated story after talking to somebody who advised him he had to say seven years. And the other thing is it shows that there was never there was never an inconsistent statement. I mean, there is no evidence in the record to support that he wasn't here at that time. There's nothing to oppose us. We don't have one person. We don't have one piece of paper. There's nothing that was used by the judge to support his his belief. Well, the judge didn't find either enough people who remembered seeing him in 1989 or didn't believe the people who all did say they saw him in 1989. But he found this is the sort of ironic thing about it. The judge never said the people were lying. He's never said the people weren't weren't credible. He had some time to talk to the person who was the head of the program operations for the Washington Immigrant Council or Migrant Council. And he asked him specifically, how do you know he was really here in 1989? Couldn't you be confused about those dates? And he said, no, I'm positive of those dates because we were in Yakima and we had a new program. I'm in charge of it. It expanded to Seattle and it happened in 1989. And that's when I met him. Is that the same person as the minister? Oh, that's a separate person. The minister was correct either. Correct. He had a minister and he had someone who was a minister from a group that he attended or that he met in the street or whatever. And he had someone who's like in charge of the social work. I guess it would be called for like my migrant worker type. Yeah, it was a special program. Washington in Seattle. They have a millionaires club, which we mentioned briefly. And it talks about the providing jobs for homeless. And they were a special program that came to try and assist migrant workers in finding jobs. And that's what he came to Seattle. Now, as I understand it, and the government could advise me if I'm wrong in this, the immigration judge had before the immigration court no evidence that said he was somewhere else at that time. That's right. They didn't have any evidence. Like some witness testified. I lived in some city in Mexico and he was working at this job there and he wasn't. So he couldn't have been in the States. There was no evidence like that. It's just like that. The the immigration judge thought that the quality of the evidence from verbal statements from from sworn testimony and declarations or affidavits was not adequate. That's correct. There had to be more documentary proof. And as I read the immigration judge, he said, well, we've got documentary proof starting in a certain date. I forget when it was. Ninety or ninety one. Ninety one. And so we have that for them. Should have had it for earlier if that you're telling the truth. So how do you answer that? It's hard for me to answer it. If a person's on a homeless and they're on the street, they're not going to have that kind of information. I mean, the other thing the judge said was that he shouldn't have been homeless. They said that he came to this country to improve himself. So why wasn't he a member of the millionaires club that he's whatever that was that he used to stand in front of for work? They said it was inconsistent that he claimed he came to the country to improve his economic conditions. But he had hadn't gotten himself a job and was homeless. Well, he was working from time to time. He didn't have a home yet. What about all the people who came to America searching for those streets that were paved with gold? Well, they intended to find a job deported. What about the millionaires? I mean, in fairness to the immigration judge on this. I mean, isn't there a way like the people go there? They can they register and others don't they? I thought he thought there was some sign in process. And there was no record that petitioner had status had had signed in and registered with the millionaires club in some way. So, I mean, am I right that there is a way some people who go to the millionaires club put their name on something that's in a permanent record, which here wasn't done. But I also I guess your position is people work, get jobs from the millionaires club who don't register as well. Yeah, I mean, we're going outside the record, but basically what the millionaires club is, is there is a way to sign up to get jobs. But obviously you have to have work authorization and be entitled to be here for the rest of the group. There's a long line outside the millionaires club and people pull up in cars and people jump in and they go off and do their day labor. And that's that's the way it's traditionally done. And I think Mr. Viera testified that that's how he was able to secure work. I mean, and so there isn't a record of him because he didn't have permission to work. He didn't have a fake green card or any other document that would allow him to register. And I thought that's because I I'm from Seattle for 25 years. I thought that's how the millionaires club work, that someone could be there and someone could go snag someone to help them with some labor. But is there anything in the record that says you can get work at the millionaires club without signing up something in the record? I don't think so. Whether you do sign up. What's in the record? Anything about how the millionaires club works? There is very limited information about the millionaires club. It was just that he I believe it says that he lined up outside the millionaires club and secured employment that way. Did he say how did he just testify? I went there and I got work that way. Yes. But so it's got his testimony. Right. Nothing else. Yeah. But it doesn't we don't have a statement from the millionaires club that says this is how we work and this is what it's like outside the. It took to line up to do that. But, you know, back to what we do have. I think we have a lot. We have a whole lot for a homeless person. We have shelter information from May of 1989, a statement from a homeless shelter saying he was there in May of 1989 that we received. Again, not created contemporaneously, but it was signed and an official did state that he was there at that time. We have the statement and the and the testimony. And I think it's critical that that the Washington State Migrant Council individual actually testified because the judge had an opportunity to really ask him. How do you really know it was 1989 and not another year? And unless he believes that individual is lying or just was totally unclear at the dates, he doesn't have the judge doesn't have any basis for jumping to his conclusion. The judge says the testimony about being homeless does not have a ring of truth. Again, why? Why? Because he came to the US. And as you originally said, and he didn't find work right away and he was homeless. Well, there's another issue here. We have a mentally ill man and he has been able to function in our society and function effectively at a level that I think is amazing. For somebody who is operating under the handicap that he's operating under. And when he came to the United States, he didn't have that assistance, but he did get it and he's had a stable job and he secured help. What do we have in the record as to the state of his mental health from 89 to 91? We don't have anything in the record because at that point he wasn't he wasn't didn't have treatment. So we don't have any record of any treatment because he wasn't getting it. What I'm trying to figure out is what we either know or may legitimately infer about his mental status between 89 and 91. And therefore, what we might infer about what he might have done, whether he would automatically have done sort of gotten himself an illegal green card, gotten himself an address and so on. But we don't have direct evidence. All we have is what we can infer from his mental state later. Right. What we have is we have information from his medical records and from his mental health records indicating that he had quite a long history of mental illness. At the time of the hearing, Mr. Viera said his problems didn't start until after he had problems with his son. But we're talking about a person who has serious mental health issues and maybe isn't totally able to evaluate the level of his own mental health. That's your time has expired. If you have anything urgent you haven't reached to tell us in about 30 seconds. OK. I think that we pretty much covered it except for one other thing, and that is that when the judge was talking about the testimony of Mr. Hernandez, who was the I mean, not Mr. Hernandez, the first Samuel Martinez and oh, and Pastor Hernandez. He said he thinks that Pastor Hernandez probably was unclear about the dates of when he knew Viera Villegas, even though he slept in the van that he had for the homeless. And even though Mr. Hernandez even took him into his own home during that period of time. And the reason he says is that he met hundreds of people like responded. How could he possibly remember him? And I think that's very telling. And I think that's very telling because in my opinion, in the evidence that we presented here, there was no possible way we could have convinced this judge. No level of evidence we could have presented other than perhaps a driver's license from that time period to show that this individual was here. He was a homeless man. And as far as the judge was concerned, he was one of hundreds. And everyone remembers him because he's a unique individual. And if you had an opportunity to look at this record, you'll see that this man is amazing. And when I say I'm honored to represent him, I mean it. I think he is an incredible person. And we proved it. And people remember him because of who he is. And the residency issues are established. Thank you. Thank you. Good morning, Your Honor. Terry Skadron for the respondent. As the court apparently recognizes, the sole issue before the court is whether substantial evidence supports the immigration judge's determination that Vera Villegas failed to establish the requisite seven years of physical presence in the United States. Now, that inquiry is not whether there was evidence in the record to oppose his claim that he satisfied the residency requirement. He bore the burden of proof on that issue, and the immigration judge determined that he failed to satisfy his burden of proof. Well, let's address that because I'm very troubled by the immigration judge's position on this case. In virtually every area of the law that we have, people prove antecedent facts by verbal testimony in court or by declarations or affidavits that go backwards. They have contemporaneous records when they exist, and that often adds a lot of credibility. But it's just routine in every kind of litigation across the board, antitrust suits, contract suits, discrimination suits, that people prove things that happened in the past by saying under oath that they happened. And if they don't have documents that we would expect to exist, that goes to wait, and that can be relevant. But there's no requirement universally that proof can only be made by documentary evidence, and it would be kind of a tragedy for the legal system if we were to countenance that. So why should we impose that requirement on someone who was a homeless person when we wouldn't impose it, you know, on Bill Gates or on Craig McCaw or on some big company that comes before us and explains what they did by affidavits that said, you know, we did this on such and such a date. We don't have a record of it, but this is what happened. Your Honor, the government doesn't disagree with that proposition. We don't read the immigration judge's decision as requiring or foreclosing the possibility that this petitioner could meet his burden of proof through testimony and affidavits. In fact, the immigration regulations expressly provide for the provision of affidavits where primary or secondary evidence is unavailable. That's 8 CFR 103.2B2. Those regulations, though, do also provide that the quality of the evidence in the affidavits and testimony must be sufficient to overcome the lack of the documentary evidence. Assume for a moment that his story as to where he was and what he did from 89 to 91 is true. Is there anything that he could provide, given the truthfulness of that story, that would have satisfied the burden of proof that the IJ put on him? I find there's an incredible amount of testimony from people who say, I saw him then and I dealt with him then. I understand the band then. I mean, I'm astounded that he's able to get this much, given that that's the story. Given that, yes, I believe that had he been able to produce affidavits with greater specificity than he did produce, had he. And greater specificity, for example. For example, there are a series of declarations in the record, affidavits from acquaintances, who each one throughout they say, I know that Vera Villegas was in the United States from February 89 through April 1996. And then there's a space on the affidavit. It's a preprinted form for how did you know that? Well, one of those declarants left that portion blank. Another one said that she met the petitioner through a co-worker on December 24, 1996. Well, take the ones that are more strong in his favor. That is to say the friend who slept with him under the Jackson Tree Bridge. Now, he didn't leave a blank at all. That's how he knew it. Now, it turns out he can't remember the names of the kid. I mean, it's an unusual name. It's an unusual name, but I can't remember what it is. He doesn't know the name of the wife. Are you saying if he had remembered the name of the wife, then it would be okay? I mean, it seems to me that we're asking for things that are not reasonable to ask for. Or maybe I'll say it this way, to say simply because he can't remember the name of the child, or the son, at a time that by definition is a long, long ago, we therefore don't believe the core of the story. That seems preposterous to me. Sometimes we disbelieve people because they remember too much detail. How could he possibly remember da-da-da-da-da? That sounds rehearsed to me. Well, part of this petitioner's problem is that he had to pinpoint with real specificity, you know, a precise date that he arrived in the United States, because he's right on the cusp of the seven years. All he had to do was specify that he arrived before that date. He didn't have to say that I arrived on that date. Right. But he has exactly, if he's believed, seven years. Now, for any petitioner, that would be difficult to prove. There's not a lot of room for leeway here. And, yes, his burden was. See, that's not what the immigration judge was bothered about, that he might be off by a couple of days. He discounted the whole story, that he was homeless, because he said he didn't understand why somebody who wanted to come here and prosper would be homeless. Well, Your Honor, let's look at some of his specific evidence. And, you know, Judge Fletcher's raised the testimony of the witness, Miguel Valencia, you know, who he says they were homeless together in, I guess it was the summer of, well, it was in 1990 because Valencia had not arrived in the United States until February 1990 himself. Therefore, he would have no personal knowledge of this petitioner being able to satisfy the full seven year requirement. Valencia himself, though, testified that he obtained, even notwithstanding his homelessness, a Washington State I.D. card within a couple months of his arrival. Now, how do you suppose he got that Washington State I.D. card? There's nothing in the record to indicate how he did so. He lied to get it? I would have to speculate. The reason I ask that is I had a case on my last month's calendar where a man comes into this country illegally, gets illegal papers, gets a job, uses these illegal papers and illegal social security number to get a job, uses the number when he fills out the form, works in this country for two years and goes home. Then comes back to this country illegally, married to an American citizen. But then he gets caught up in post 9-11 things because he's from the Middle East. The government prosecutes him successfully on seven counts of lying on papers and puts him in jail for these papers. And you're saying he should have had such papers so you could put him in jail just like we did this other time? No, Your Honor, but we're to focus the court's inquiry on. Well, I'm going to focus the court's inquiry on the papers you think he should have had, the use of which would be illegal and for which you put people in jail. Well, ultimately, this petitioner did apparently use some fraudulent documents, which is where he begins his documentation of his presence in 1991. There is no suggestion here that anyone has any interest in prosecuting Mr. Vera Villegas. But I do find it ironic that the government is here insisting on pieces of paper, the use of which would be illegal and for which the government put other people in jail. No, Your Honor, we're not insisting upon him producing illegal evidence. We're merely pointing to the lack of evidence. The issue is whether the evidence before, the record before the immigration judge was so strong that no reasonable fact finder could fail to find in Mr. Vera Villegas's favor on this point. Well, there was no contradictory evidence, right? There was no evidence from someone saying, I observed the petitioner when he was in a different, you know, he was in Romania or he was in Tokyo at that time or he was in Mexico, but he sure wasn't in Seattle. There's no evidence like that. All there is is the immigration judge saying sworn testimony of several witnesses is not sufficient in quality because we don't have corroborating documentary evidence. Your Honor, there were two possible explanations for the lack of corroborating evidence before 1991 because I think everyone agrees. Putting aside the explanations, isn't it correct, as I've just stated the case, that there is no affirmative evidence that he wasn't here? The only issue is the immigration judge's view that there wasn't sufficient documentary corroboration of the verbal declarations put in by several witnesses. That's correct. The only issue was whether the immigration judge reasonably found that the quality of evidence submitted was insufficient to carry the verdict. So what's the substantial evidence that shows that the quality of what was submitted was inadequate? Your Honor, it's a matter of evaluating does the – is the evidence so strong that it pulls him over his burden of proof? One point, I realize my time is almost up. And I'm trying to supplement or fill in with – in assisting you in answering your question, I don't want to get ahead of myself. What is his burden of proof in front of the IJ, preponderance of the evidence? Preponderance of the evidence, but that's not the burden at the appellate stage. But I'm trying to ask, what is it that we say that IJ had to find, and it's unreasonable for the IJ not to find? IJ had to find if there was preponderance of the evidence that he was entitled. Okay. I'm sorry to interrupt, but that's – Well, that was the question before the IJ. What you're trying to show is the substantial evidence to support the IJ's determination that there isn't a preponderance of the evidence. Well, no. We're not applying a preponderance standard here at all. There's a completely different standard at the appellate level. And that's the lines of that crisis. You're trying to say the substantial evidence to support the IJ's decision in the record. To support the IJ's decision. And his decision is that there's not a preponderance of evidence. But you've got to have substantial evidence that there isn't a preponderance of evidence. That there is – that the standard is stated. That there is – that no reasonable fact finder could fail to find that he established his residency from February 89 forward. But you said at the beginning that there's substantial evidence in the record to support the decision. That's – I was stating that it is controlled by the substantial evidence standard, which is that the standard is – I know. We love all these words and phrases that mean very little. It's a label that's slapped on this test. It makes no sense when you're applying it in reverse. It's fine to say you win if you can show substantial evidence. It's not so fine when you're showing substantial evidence that the other side shouldn't win. That somehow in the record you're not – you're really talking about an absence of evidence. Because you don't – you object to the quality of the evidence. It's an objection to the quality of the evidence. And that it's not – it would not compel a reasonable fact finder to find residency since February 89. So I – one other point, though, I'd like to raise, though. Part of the petitioner's explanation for his protracted alleged state of homelessness, you know, is his mental illness. And one matter in the record I'd like to point out is that his documentary evidence all starts in 1991. From that point forward, there's a wealth of evidence. There is no record evidence that he began treatment for any mental illness until 1992. That was Deborah Smoky, his therapist, testified that the clinic records date back to 92. So what was it that happened in 91 that suddenly, you know, he's getting Washington State ID, he's, you know, getting employment? Well, he may have found somebody who was willing to help him do all of that. That's a possibility, Your Honor. It's also equally possible that that's when he arrived in the United States. And that all these people are lying. Well, that's – You remember the official who's running this program? It's lucky we had such a smart I.J. who could figure out all these people were part of a gigantic conspiracy. Well, the immigration judge did not find that any of these witnesses were knowingly perjuring themselves. No, he was very careful not to say it. It would have made him look really like a lunatic to say that. Instead, he tried to say, well, the minister didn't really remember which of the days he slept in his house in 89. He only could say he slept there two or three times a month, but he didn't know which specific days. So we can't credit the minister's story. Well, in light of the fact that these declarants were testifying about events that had taken place something like eight years earlier, with no documents, nothing to refresh their recollection, it is the type of testimonial evidence that I think any court would very closely scrutinize. So, Your Honor, I think you would say if you – I hope if you were the I.J. and this case came before you, you would say this is a remarkable quality of evidence. The number of witnesses that have come forward, the poor man, compared to what I normally see in immigration cases, it's really remarkable that there are all these dedicated people who have been willing to come forward and do this. He's put on a remarkable demonstration. And this is a unique case, I hope you would say, had you been the immigration judge. Well, I was not the immigration judge. I hope when you go back to Washington, you do come from Washington. Yes, I do, Your Honor. You could say the government still has the tender mercies of the attorney general that this person has to pass once you decide that he is eligible. Then he's still got the hardship problem and he's got the discretion of the attorney general. So, you know, I don't know what he's going to win when he wins, assuming he wins on the seven years. But it would be nice if that's because you've reviewed this record. You went back and said, boy, this is really somebody that the attorney general should exercise his discretion in favor of, unlike a lot of people that maybe aren't greeted with such care and tenderness by the administration. Well, Your Honor, I won't concede the physical presence point at this juncture. It is a record, I'll just say in closing, that reasonable minds could differ on, and that's precisely why in applying faithfully the substantial evidence standard of review, the court should sustain the agency determination. Well, I think that you've done a valiant job for your client and done the best you could with the issues, and yet you know that you've stated the law accurately. Thank you very much, Your Honor. Thank you. One final comment, Your Honor, and that is the INS didn't, in the process of the hearing, they weren't even contesting the residency issue. That was brought up by the judge, raised by the judge. That was the judge's issue. And yet the same requirement, the factual allegation that had to be made about entry, an illegal entry that was presented by Mr. Vieira, they didn't have independent evidence of how he entered and when he entered. He found that when we conceded that part, that that met the standard of clear and equivocal and convincing evidence that he did, in fact, enter on that date and that time. And yet he found that the other evidence that we submitted didn't meet the preponderance of evidence. And I find that also very revealing of this whole case. Thank you. Can I ask you one question? Yes. We see a lot of these cases, and I don't often see enough individual IJs to recognize the names, and I don't recognize the name of this one. Is this an immigration judge here in Seattle? It is an immigration judge in Seattle, and he just retired. And this was an issue that we had again and again and again. And it is a particular problem with immigration cases as to what level of evidence they require, whether they're requiring contemporaneous. But this judge in particular always demanded it in order to satisfy this requirement. Thank you both very much. The case will be submitted. The next case for argument is Mann v. American Airlines. Thank you.
judges: Reinhardt, W Fletcher, Gould